# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 12-1068

**CLYDE SNIDER, JR. ET UX**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, ET AL.**

\*\*\*\*\*\*\*\*\*\*
**APPEAL FROM THE**
**THIRTY-SIXTH JUDICIAL DISTRICT COURT**
**PARISH OF BEAUREGARD, DOCKET NO. 2010-1220**
**HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE**
\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Judges Sylvia R. Cooks, Billy H. Ezell and James David Painter.

**REVERSED. JUDGMENT RENDERED AS TO LIABILITY. REMANDED FOR DETERMINATION OF DAMAGES.**

Broussard, Halcomb & Vizzier
Daniel E. Broussard, Jr.
P.O. Box 1311
Alexandria, LA  71309-1311
(318) 487-4589
**ATTORNEY FOR PLAINTIFFS/APPELLANTS**
Clyde Snider, Jr. Et Ux

Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
Benjamin J. Guilbeau, Jr.
P.O. Box 2900
Lake Charles, LA  70602
(337) 436-9491
**ATTORNEY FOR DEFENDANT/APPLELLEE**
Louisiana Medical Mutual Insurance Comp., Et Al.

**Cooks, Judge**
## FACTS AND PROCEDURAL HISTORY

Clyde Snider, Jr. (Snider) received medical treatment from Dr. Robin Yue (Dr. Yue) at Beauregard Memorial Hospital (Beauregard) in August 2007. Dr. Yue performed a pacemaker implant on Snider. Snider, only twenty-six years old, had a personal and family history of heart trouble, diabetes, and high blood pressure. Snider's primary cardiologist was Dr. J. King White, M.D. (Dr. White) at Christus St. Patrick Hospital (St. Patrick) in Lake Charles, Louisiana. Snider went to the Emergency Room at Beauregard on August 28, 2007, because he was experiencing chest pain and had a very low pulse rate. According to Snider, and his wife Lisa Snider, (Lisa) (now Lisa Clark) he asked to be transferred to St. Patrick to be attended by his cardiologist, Dr. White, but was told he was in too serious a condition to be sent anywhere. Snider testified if he would have been told of an alternative to an immediate implant at Beauregard which would have allowed him to get the advice of his regular cardiologist, Dr. White, he would have refused the implant. Dr. Yue testified that he did not recall Snider asking to be transferred. Dr. Yue believed Snider required immediate attention and scheduled him for a heart catharization. He performed the heart cath and allegedly informed Snider and his wife that Snider needed a pacemaker implanted because of his heart history, family heart history, and low pulse rate at the time. Snider and his wife testified that Dr. Yue informed them he thought it was necessary to immediately implant a temporary pacemaker because of Snider's serious condition in order to make him stable enough to be transported to St. Patrick's.

Just before the procedure, *Snider signed a partially blank consent form* purporting to signify his consent to the procedure. The record contains the consent form, still displaying several blank lines and containing a typed-in line and a

handwritten note. The implant procedure took about twenty minutes with a small incision made in Snider's chest leaving a permanent scar. Snider suffered pain in his left arm and did not have normal use of that arm for several weeks.

Upon arriving home from Beauregard, Snider was injured when his two-year-old daughter jumped into his arms upon seeing him return home from the hospital before she could be warned to be careful. Snider returned to Beauregard and was eventually treated for an infection at the site of the pacemaker implant. Snider then went to be examined by his cardiologist, Dr. White, and in due course the pacemaker was removed. Dr. White opined that the implantation of the pacemaker was unnecessary and unwarranted given Snider's condition when he went to Beauregard.

The three-member Medical Review Panel found Dr. Yue violated the standard of care in performing the implant on Snider under the non-emergent circumstances. Dr. White and one panel member testified likewise at trial, and it was stipulated that the two additional Medical Review Panel members would have testified the same. Dr. Yue and his medical expert witness testified that Dr. Yue's implantation of the pacemaker was one possible appropriate choice and thus did not constitute medical malpractice. They agreed that another option would have been to temporarily take Snider off of a particular heart medication he was taking, and wait to see if that helped Snider return to a more acceptable heart rate.

Trial was had before a jury of twelve who ruled 10-2 in favor of Dr. Yue, finding he did not violate the standard of care and that his actions in performing the pacemaker implant was not medical malpractice.

The trial court denied Snider's motion for judgment notwithstanding the verdict. Snider appeals the jury's verdict and the denial of his motion for judgment notwithstanding the verdict.

# LEGAL ANALYSIS

This is not a case of a doctor bungling a procedure, nor is it a case of a doctor performing a completely unnecessary procedure. It is also of no moment whether Dr. Yue stood to better his financial debt to Beauregard by performing this surgery rather than sending Snider to his cardiologist in Lake Charles as Snider maintains he requested. (Dr. Yue testified he was paid a large financial incentive to come to work at Beauregard and was obligated to repay a portion of his salary if he did not generate a specified minimum amount of fees within a specified time.) This case is purely and simply a case of whether Snider gave an informed consent for the procedure performed on him.

The law regarding informed consent in medical malpractice claims is well-settled in Louisiana. It is both statutory and jurisprudential. *Tipton v. Campbell*, 08-139, 08-140 (La.App. 4 Cir. 9/24/08), 996 So.2d 27, *writ denied*, 08-2564 (La. 1/9/09), 998 So.2d 720. In *Maybrier v. Louisiana Medical Mutual Insurance Company,* 08-1508, p.8, (La.App. 3 Cir. 6/10/09), 12 So.3d 1115, 1121, *writ denied* 09-1558 (La.10/9/09), 18 So.3d 1287 (emphasis added), we explained the doctrine of informed consent:

> The informed consent doctrine is based on the principle that *every adult of sound mind has the right to determine what will be done to his or her own body. LaCaze v. Collier*, 434 So.2d 1039 (La. 1983). Where circumstances permit, a patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved, the prospects of success, the risks of failing to undergo the treatment or procedure, and the risks of any alternative methods of treatment. *Hondroulis*, 553 So.2d 398.

Additionally, in *Maybrier*, 12 So.3d at 1122, we further noted "the Louisiana Supreme Court established the rule that a physician may not act beyond his patient's authorization, except when a situation seriously threatens the health or life of the patient." The informed consent doctrine is embodied in Louisiana law in

3

La.R.S. 40:1299.40[1] (emphasis added), which provides in pertinent part:

>   A.(1)  Nothwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, or death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. *Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.*

>   . . .

>   (B)  Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such consent.

>   . . .

>   E(2)(a)  In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.

>   E(2)(b)  Consent to medical treatment may be evidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the secretary pursuant to the provisions of the Subsection as another method by which to evidence a patient's consent to medical treatment.

La. R.S. 40: 1299.40.

---

[1] Repealed by Acts 2012, No.759, §3 effective June 12, 2012 and is now contained in La.R.S. 40:1299.39.5.

Under the Louisiana informed consent law, La.R.S. 40:1299.40, a physician is required to provide his patient with *sufficient information to allow the patient to make an informed and intelligent decision on whether to submit to the proposed course of treatment.* This information should include, if possible, "the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment." *Hondroulis v. Schumacher*, 553 So.2d 398, 410 (La. 1988) (on rehearing).

*Saurez v. Mando*, 10-853, p.8 (La. App. 5 Cir. 3/29/10), 62 So.3d 131, 135, *writ denied*, 11-855 (La. 6/17/11), 63 So.3d 1036 (emphasis added).

The record contains a copy of the written consent form signed by Snider regarding permission to perform the implantation of a permanent pacemaker. The introductory paragraph of the form states (emphasis original):

TO THE PATIENT: You have been told that you should consider medical treatment/surgery. Louisiana law requires us to tell you (1) the nature of your *condition*, (2) the general nature of the medical treatment/surgery, (3) the risks of the proposed treatment/surgery, as defined by the Louisiana Medical Disclosure Panel or as determined by your doctor, (4) reasonable therapeutic alternatives and material risks associated with such *alternatives*, and (5) risks of treatment. … Please read the form carefully. Ask about anything you do not understand, and we will be pleased to explain.

The consent form is signed by Snider and a witness and indicates it was signed on "8/28/07" at "1640." Paragraph two of the form describes the procedure as "PLACEMENT OF PERMANENT PACEMAKER AND LEADS. WITH OR W/O IV SEDATION." Paragraph 2(b) states the purpose as "IMPLANTING A SMALL DEVICE IN THE CHEST WALL TO REGULATE YOUR HEART RATE AND RHYTHM. X-RAY EQUIPMENT WILL BE USED TO VSUALIZE THE PLACEMENT OF THE PACEMAKER ELECTRODES. IV CONSCIOUS SEDATION WILL BE USED IF NECESSARY." However, the remainder of the consent form is blank. This is in accord with Snider's testimony that the form was

presented to him with the blanks not filled in. In pertinent part the consent form appeared as follows (emphasis in original):

> 3. Patient Condition:
> Patient's diagnosis, description of the nature of the condition or ailment for which the medical treatment, surgical procedure or other therapy described in item number 2 is indicated and recommended:
> _____
> .
>
> 5. Reasonable therapeutic alternatives and risks associated therewith, risks of no treatment.
> _____
>
> SYMPTOMS FROM THE ABNORMAL HEART RATE WILL CONTINUE.

Paragraph four of the form covers "Material Risks of treatment procedure" and reads as follows:

> (a) All medical or surgical treatment involves risks. Listed below are those risks associated with this procedure that we believe a reasonable person in your (the patient's) position would likely consider significant when deciding whether to have or forego the proposed therapy. Please ask your physician if you would like additional information regarding the nature or consequences of these risks, their likelihood of occurrence, or other associated risks that you might consider significant but may not be listed below.
> -See attachment for risks identified by the Louisiana Medical Disclosure Panel
> - See attachment for risks determined by your doctor.
> Additional risks (if any) particular to the patient because of complicating medical condition are:_____
> _____
> _____.
> (b) Risks generally associated with any surgical treatment/procedure, including anesthesia are: death, brain damage, disfiguring scars, quadriplegia (parapysis from neck down), paraplegia (paralysis from waist down), the loss of function of any organ or limb, *infection*, bleeding, and *pain*.

Attached to the form are two pages, one entitled "Conscious Sedation Consent" and the other entitled "Material Risks Identified By The Louisiana Medical Disclosure Panel." The first page is not signed by Snider nor any witness.

6

The Second page is signed by Snider and a witness and is dated "8/28/07" at "1640", and includes a list of "Material Risks Identified By Physician." This list, bearing "x" marks indicating these risks are "very uncommon" includes the following: "Longer Hospital Stay; Repeated Surgery, Infection, Lead Dislodgment, Bleeding, Infection, Lead Problems, Pacemaker Problems, Death."

Snider also signed a Consent Form dated "8-29-07" at 0600 which listed as the "Treatment/Procedure" to which he was consenting "Coronary/Renal/Carotid/Peripheral Angiogram. With or W/O Sedation" and listed the "purpose" as "Visualization or arteries looking for blockages or anomalies, by Injection Contrast and Using X-Ray Equipment. IV Conscious Sedation Will Be Used If Necessary." This form also left Paragraph 3 "Patient Condition" blank, and explained the material risks of this procedure under paragraph four by reference to two pages attached, both signed by Snider. Paragraph five of this form entitled "Reasonable therapeutic *alternatives* and risks associated therewith, risks of no treatment" simply stated "potential for worsening of vascular disease and possible ischemic events." (emphasis added)

Subsection E of La.R.S. 40:1299.40 at Paragraph (7)(a) (emphasis added) provides:

> In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the negligent failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider:

> (i) Both the disclosure made as provided in Paragraph (5) of this Subsection and the failure to disclose based on inclusion of any medical care or surgical procedure of the secretary's list for which disclosure is not required shall be admissible in evidence and shall create a rebuttable presumption that the requirements of Paragraphs (5) and (6) of this Subsection have been complied with, and this presumption shall be included in the charge to the jury;

7

and

(ii) The failure to disclose the risks and hazards involved in any medical care or surgical procedure required to be disclosed under Paragraphs (5) and (6) of this Subsection, shall be admissible in evidence and shall create a rebuttable presumption of a negligent failure to conform to the duty of disclosure set forth in Paragraph (5) and (6) of this Subsection, and this presumption shall be included in the charge to the jury; but failure to disclose may be found not to be negligent, if there was an emergency as defined in R.S. 40:2113.6(C) or, if for some other reason, it was not medically feasible to make a disclosure of the kind that would otherwise have been negligence.

. . .

(c) *In order to be covered by the provisions of this Subsection, the physician or other health care provider who will actually perform the contemplated medical or surgical procedure shall*:

(i) Disclose the risks and hazards *in the form* and to the degree required by the secretary;

(ii) *Disclose additional risks, if any, particular to a patient because of a complicating medical condition, either told to the physician or other health care provider by the patient or his representative in a medical history of the patient or reasonably discoverable by such physician or other health care provider;*

(iii) *Disclose reasonable therapeutic alternatives and risks associated with such alternatives;*

(iv) Relate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the secretary; and

(v) Provide an opportunity to ask questions about the contemplated medical or surgical procedure, risks, or alternatives and acknowledge in writing that he answered such questions, to the patient or other person authorized to give consent to medical treatment, receipt of which shall be acknowledged in writing.

The consent form signed by Snider does not comport with the statutory requirements set forth above. The statute clearly requires a health care provider

8

such as Dr. Yue to disclose "in the form" not only the risks of the procedure, as was disclosed here, but also the additional risks posed by Snider's medical condition which included the effects of the medication he was taking. More importantly, Dr. Yue was also required to explain on the form, perhaps using the blanks provided and labeled for such information, the reasonable therapeutic alternatives and the risks associated with those alternatives. Nowhere are these set forth on the form. Additionally, this form failed to set forth any information regarding Snider's immediate condition which allegedly necessitated the proposed procedure. Such information was critical to Snider's decision-making process. Likewise, the form contains no information suggesting that Snider's immediate condition was so critical that he virtually had no choice but to consent to the pacemaker implant.

Snider and his wife testified that they understood that he was not stable enough to be transported to Lake Charles to be attended by his regular cardiologist, which they maintain was his desired course of treatment. The medical evidence, expert testimony, and even Dr. Yue's own testimony, demonstrate that Snider's condition in fact was not critical or emergent. The Medical Review Panel unanimously found "*Dr. Yue rushed the decision* for implantation of a permanent pacemaker in this patient. He should have stopped the beta-blocker and the rivaroxabhan for 24-48 hours, and monitored the patient for possible improvement or deterioration in heart rate, before *making the decision* about a permanent pacemaker." (emphasis added). This is the very reason the statute requires the form contain an explanation of the patient's present condition. It is only by understanding the nature of his condition at the time of the proposed procedure, and whether it is emergent or not, that a patient can make a knowing, voluntary, and reasoned consent to a proposed immediate medical procedure. Without such

9

information put on the form we are left to rely on the doctor's word after-the-fact as to what the patient was told when he was being asked to consent to or to decline the proposed treatment or procedures.

Likewise, it was also extremely important in this decision-making process for Snider to know if there were any reasonable therapeutic alternatives and what risks were posed by these alternatives, as well as what risks he was exposed to if he refused to have this procedure performed immediately. The medical evidence here, including Dr. Yue's testimony, the defense's medical expert, and Snider's medical experts shows that there were indeed reasonable therapeutic alternatives which did not expose Snider to serious risks, and that his condition at the time was not so emergent that refusing this procedure at that time posed a serious threat to his life. As Dr. Yue testified, Snider's condition at the time he recommended the pacemaker implant was not life-threatening. The medical experts in the case agreed with that assessment. In short, there were reasonable alternatives but Snider was not allowed to make the decision based on all the facts. As the Medical Review Panel acknowledged, Dr. Yue made the decision for Snider and inappropriately rushed to that decision. A careful review of Dr. Yue's testimony makes this quite clear. He and his expert witness explained there were in fact reasonable alternatives to immediately implanting a pacemaker but they argue that *Dr. Yue's decision* to perform the procedure was also a reasonable choice. The problem with this argument is that it was not Dr. Yue's choice to make, it was Snider's choice, and he was supposed to have been given all of the information he needed to make his choice about his care and treatment. The statutory requirements regarding the written consent form exist so that when the matter is called into question in the future, as it is here, there is a clear written record of what the patient was or was not told enabling a fact finder to determine whether the

10

patient did in fact give informed consent as defined in the statute. In this case, the empty blanks on the form speak loudly. Snider has demonstrated that although he signed a consent form he did not give informed consent for this procedure. According to the written form, Snider was bereft of the information he needed to make an informed decision. His testimony and his wife's testimony are in accord. Further, according to the testimony at trial, the choice to implant a pacemaker in Snider to remedy his condition at that moment was made by Dr. Yue, not his patient.

In accordance with the holdings in *Lugenbuhl v. Dowling,* 96-1575 (La. 10/10/97), 701 So.2d 447 and *Jackson v. State*, 05-2021 (La. 9/29/06), 938 So.2d 688, we find Snider has met his burden to prove that his consent would have been reasonably withheld if he had been adequately informed of the non-emergent nature of his condition and of the low-risk alternative of doing nothing. The consent form itself, through its insufficiencies, bears witness that Dr. Yue breached his duty to adequately inform Snider of the nature of his immediate condition and to adequately inform him of reasonable alternatives including the choice of no treatment. Snider has shown that Dr. Yue's breach of his duty was the cause-in-fact of Snider's damages. "[T]he defendant's proper performance of his or her duty would have prevented the damages." *Lugenbuhl*, 701 So.2d at 454. Second, we find Snider has also shown that "a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure" had the material information been disclosed *Id.* (*citing LaCaze v. Collier*, 434 So.2d 1039 (La.1983); *Hondroulis*, 553 So.2d at 398; and *Canterbury v. Spence*, 464 F.2d 772.)

We therefore reverse the judgment of the trial court and render judgment in favor of Plaintiffs. Although the record contains some stipulations as to medical

11

costs and references to the costs of the litigation, the trial judge elected to bifurcate the evidence concerning damages pending the jury's decision in the matter. The jury's decision finding no liability aborted further proceedings in the matter. We therefore remand the matter to allow the parties an opportunity to complete the record regarding damages due Plaintiffs.

## DECREE

Judgment is rendered in favor of Plaintiffs. All costs of this appeal are assessed against Defendants/Appellants. The case is remanded to the district court for a determination of the amount of damages to be awarded to Plaintiffs.

**REVERSED. JUDGMENT RENDERED AS TO LIABILITY. REMANDED FOR DETERMINATION OF DAMAGES.**