# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 12-1068

**CLYDE SNIDER, JR. ET UX**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, ET AL.**

**\*\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**THIRTY-SIXTH JUDICIAL DISTRICT COURT**
**PARISH OF BEAUREGARD, DOCKET NO. 2010-1220**
**HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE**
**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Billy H. Ezell and James David Painter, Judges.

**REVERSED: JUDGMENT RENDERED AS TO LIABILITY: REMANDED FOR DETERMINATION OF DAMAGES.**

Broussard, Halcomb & Vizzier
Daniel E. Broussard, Jr.
P.O. Box 1311
Alexandria, LA  71309-1311
(318) 487-4589
**ATTORNEY FOR PLAINTIFFS/APPELLANTS**
Clyde Snider, Jr. Et Ux

Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
Benjamin J. Guilbeau, Jr.
P.O. Box 2900
Lake Charles, LA  70602
(337) 436-9491
**ATTORNEY FOR DEFENDANT/APPLELLEE**
Louisiana Medical Mutual Insurance Comp., Et Al.

**Cooks, Judge**

## PROCEDURAL HISTORY

The Louisiana State Supreme Court in *Clyde Snider, Jr. Et Ux. v. Louisiana Medical Mutual Insurance Company, Et al.*, 13-579, (La. 12/10/13), 130 So.3d 922, reversed this court's decision in which we found the jury committed legal error in rendering a verdict finding Dr. Yue did not commit medical malpractice. It then remanded the case for this court to consider all of Plaintiffs' assignments of error including those not previously addressed by this court. On first review we found Plaintiff's alleged consent to the surgical procedure, which is the focus of his malpractice claim, did not constitute informed consent as required by La. R.S. 40:1299.40. We held the jury legally erred in finding the contrary, and we reversed the jury's verdict. The supreme court has instructed us on remand to reconsider that issue applying the manifest error standard of review. The supreme court also declared that "compliance with the requirement of informed consent was alternatively attainable under Subsection (A) or (C) of LSA-R.S. 40:1299.40." Id. at 939. In accordance with the supreme court's instruction we have reviewed the matter applying the appropriate standard of review on the issues presented by Plaintiff.

## RELEVANT FACTS

Clyde Snider, Jr. (Snider) received medical treatment from Dr. Robin Yue (Dr. Yue) at Beauregard Memorial Hospital (Beauregard) in August 2007. Dr. Yue performed a pacemaker implant on Snider. Snider, only twenty-six years old, had a personal and family history of heart trouble, diabetes, and high blood pressure. Snider's primary cardiologist was Dr. J. King White, M.D. (Dr. White) at Christus St. Patrick Hospital (St. Patrick) in Lake Charles, Louisiana. Snider went to the Emergency Room at Beauregard on August 28, 2007, because he was

experiencing chest pain and had a low pulse rate. According to Dr. Yue's testimony, Snider's pulse rate was below normal but *was not so low as to constitute an emergency situation.*

According to Snider, and his wife at the time, Lisa Snider (Lisa) (now Lisa Clark), he asked to be transferred to St. Patrick to be attended by his regular cardiologist, Dr. White, but was told he was in too serious a condition to be sent anywhere. Snider testified if he would have been told of an alternative to an immediate implant at Beauregard, which would have allowed him to get the advice of his regular cardiologist, Dr. White, he would have refused the implant. Dr. Yue did not "outright" refute Snider's version of events leading up to the surgery. Rather, he simply testified he did not recall Snider asking to be transferred. He also testified he did not offer Snider the option to be transferred so that his regular cardiologist could oversee his care and treatment. Instead, Dr. Yue performed a heart catheterization and then proceeded to the operating room to perform a pacemaker implant. The implant procedure took about twenty minutes with a small incision made in Snider's chest leaving a permanent scar. Snider suffered pain in his left arm and did not have normal use of that arm for several weeks.

Just before the procedure, *Snider signed a partially blank consent form* purporting to signify his consent to the procedure. The record contains the consent form, still displaying several blank lines and containing a typed-in line and a handwritten note.

After returning home from Beauregard, Snider was injured when his two-year-old daughter jumped into his arms upon seeing him before she could be warned to be careful of his pacemaker implant. Snider returned to Beauregard and was eventually treated for an infection at the site of the pacemaker implant. Snider then sought examination by his cardiologist, Dr. White, who determined that the

2

implantation of the pacemaker was medically unnecessary and unwarranted. In due course the pacemaker was surgically removed and Snider has not been the worse since.

The three members of the Medical Review Panel found Dr. Yue violated the standard of care in performing the implant on Snider under non-emergent circumstances. Dr. White and one panel member provided live testimony at trial and the parties stipulated that the two additional Medical Review Panel members would have testified the same. Dr. Yue and his medical expert witness testified that because Dr. Yue's implantation of the pacemaker was one possible appropriate choice his decision to immediately perform a permanent pacemaker implant did not constitute medical malpractice. They agreed, however, with the other medical experts that another option would have been to temporarily take Snider off of a particular heart medication he was taking and wait at least twenty-four hours to see if that helped Snider return to a more acceptable heart rate. According to the testimony of five medical experts in the field of cardiology, the medical records show Snider was stable at the time he was initially examined by Dr. Yue. Additionally, his decision to proceed so quickly with a permanent implant after administering only one dose of a beta-blocker constituted treatment below the standard of care and was not in keeping with the national guidelines for "Indications for Permanent Cardiac Pacing" as published by the joint task force of the American College of Cardiology, the American Heart Association, and the Heart Rhythm Society.

After careful review of the record a second time, we now find the jury *manifestly erred* in failing to find that Dr. Yue's actions fell below the acceptable standard of care in light of the strong preponderance of evidence and testimony at trial.

# LEGAL ANALYSIS

Snider argues several assignments of error on appeal. He asserts the jury erred in concluding that he failed to prove by a preponderance of evidence that Dr. Yue "deviated from the appropriate standard of care." He argues the jury erred in finding he gave informed consent for the procedure under the provisions of La. R.S. 40:1299.40. Snider also maintains Dr. Yue rushed his decision to perform a pacemaker implant without all of the necessary medical information available concerning Snider's condition and without attempting to contact Snider's regular cardiologist. He further contends Defendants failed to show that the opinion reached by the Medical Review Panel was unreasonable. Additionally, he maintains Dr. Yue should have disclosed to him his financial incentive arrangement with Beauregard before performing the pacemaker implant and that Dr. Yue's undisclosed financial incentive to perform such an operation was the reason Dr. Yue failed to contact Snider's treating physician and refused to consider transporting him to St. Patrick's for care and treatment. Snider contends Dr. Yue's failure to make this disclosure was a violation of the standard of care.

The law regarding informed consent in medical malpractice claims is well-settled in Louisiana. It is both statutory and jurisprudential. *Tipton v. Campbell*, 08-139, 08-140 (La.App. 4 Cir. 9/24/08), 996 So.2d 27, *writ denied*, 08-2564 (La. 1/9/09), 998 So.2d 720. In *Maybrier v. Louisiana Medical Mutual Insurance Co.*, 08-1508, p.8, (La.App. 3 Cir. 6/10/09), 12 So.3d 1115, 1121, *writ denied,* 09-1558 (La. 10/9/09), 18 So.3d 1287 (emphasis added), we explained the doctrine of informed consent:

> The informed consent doctrine is based on the principle that *every adult of sound mind has the right to determine what will be done to his or her own body. LaCaze v. Collier*, 434 So.2d 1039 (La. 1983). *Where circumstances permit, a patient should be told the nature of the pertinent ailment or condition, the general nature of the*

4

*proposed treatment or procedure, the risks involved, the prospects of success, the risks of failing to undergo the treatment or procedure, and the risks of any alternative methods of treatment. Hondroulis [v. Schumacher]*, 553 So.2d 398 [(La. 1988)].

In this case, however, it is not necessary for us on remand to visit the question of informed consent again because even if Snider gave informed consent under Sections A or B of the statute, which the supreme court finds applicable, such consent has no bearing on the question of whether Dr. Yue's actions fell below the standard of care when he rushed to implant a permanent pacemaker in the body of Snider. As noted, Dr. Yue maintains his decision to do so did not constitute malpractice because he deemed it an "appropriate choice." Therein lies the legal quagmire upon which Dr. Yue's position rests.

According to four medical experts who testified in this matter, including Snider's treating physician, Snider's condition was not critical or life-threatening at the time. Dr. Yue and his expert witness agree with that assessment. Dr. Yue testifies in his own opinion, although Snider's heart rate was abnormally low it was not so low as to pose an immediate threat. Additionally, Dr. Yue's expert witness, Dr. Freddy Michel Abi-Samra, (Dr. Samra) testified Snider's condition was a Class II situation, meaning it was not mandatory that a pacemaker be immediately implanted, and that Snider was indeed in good enough condition to be transferred to St. Patrick's hospital in Lake Charles where he could have been attended by his regular cardiologist.

The document introduced into evidence entitled "Indications for Permanent Cardiac Pacing" lists three classifications for permanent pacing as established by a joint task force formed by the American College of Cardiology, the American Heart Association, and the Heart Rhythm Society. Under these national guidelines, the three classifications are described as follows (emphasis added):

5

Class I -- Conditions in which permanent pacing is definitely beneficial, useful, and effective. In such conditions, implantation of a cardiac pacemaker is considered acceptable and necessary, *provided that the condition is not due to a transient cause.*

Class II – Conditions in which permanent pacing may be indicated but there is conflicting evidence and/or divergence of opinion; class IIA refers to conditions in which the weight of the evidence/opinion is in favor of usefulness/efficacy, while class IIB refers to conditions in which the usefulness/efficacy is less well established by evidence/opinion.

Class III -- Conditions in which permanent pacing is not useful/effective and in some cases may be harmful.

Symptoms – Patients frequently present for consideration of pacemaker placement because of symptoms that may be due to bradyarrhythmias (e.g. dizziness, lightheadedness, syncope, fatigue, and poor exercise tolerance). These patients will often have evidence of mild or intermittent sinus node dysfunction or conduction abnormalities. *It is critical to attempt to establish a direct correlation between symptoms and bradyarrhyythmias. This is done via a careful history and ambulatory monitoring.*

A direct correlation between symptoms and bradyarrhythmias will increase the likelihood of recommending pacemaker placement. *On the other hand, failure to document such a correlation or the presence of an alternative explanation for symptoms will make pacemaker placement less likely or even contraindicated.*

The medical records of Beauregard Hospital concerning Snider's condition when he was admitted on August 28, 2007, indicate Snider had no new onset of fatigue, no "chronic headaches, dizziness, syncope, stroke seizures, or numbness or tingling" though he was experiencing some episodes of nearly passing out. He was "alert, awake, in mild acute distress" with a pulse rate of 35. He is described as a "well developed, well nourished" person with a "regular [heart]rhythm S1 S2" with "no significant heart murmur." There was "no edema" in his legs. In Dr. Yue's consultation report on this same date he notes Snider "developed bradycardia" after his heart attack three months earlier and that "[h]is symptoms [progressively got worse after] he started taking Atenolol [2 weeks earlier]." He also noted that although chest pains brought Snider to the E.R. that day, by the

time Dr. Yue saw him he was "chest pain free". In Dr. Yue's Consultation Report he diagnosed Snider with "Symptomatic bradycardia" but notes "[a]lthough patient is on beta blocker, patient has bradycardia before he started Atenolol. Atenolol just made his symptoms worse."

Despite these observations, and being informed of Snider's ongoing treatment under the care of a cardiologist, and, knowing at that time Atenolol was an experimental drug, Dr. Yue admits he did not attempt to contact Snider's regular cardiologist in Lake Charles. Further, he acknowledges that it would not have posed any serious threat to Snider *to wait at least twenty-four hours or more to see if Snider's slow heart rate would normalize after discontinuing Atenolol* before implanting a pacemaker as a solution to Snider's immediate symptom. The record clearly supports a finding that Dr. Yue failed to follow the protocol established in the guidelines for "Indications for Permanent Cardiac Pacing". Significantly, he did not "*attempt to establish a direct correlation between symptoms and bradyarrhyythmias*" which "*is done via a careful history and ambulatory monitoring.*" He did not heed the warning in the guidelines that "*failure to document such a correlation or the presence of an alternative explanation for symptoms will make pacemaker placement less likely or even contraindicated*". It is clear that, when contemplating the pacemaker implant, Dr. Yue was aware of strong "alternative explanations" for Snider's symptom which had already begun to abate after his arrival at Beauregard Hospital. His decision to perform the invasive implant procedure clearly fell outside the guidelines established by the joint task force of the American College of Cardiology, the American Heart Association, and the Heart Rhythm Society; and fell below the standard of care in this specialized field.

Specifically, the record shows Snider's low heart rate could have been

caused by the new medications he was prescribed by his treating physician. The evidence also shows other reasonable alternatives to an immediate "emergency" pacemaker implant in this instance including transferring Snider to St. Patrick's for treatment by his regular cardiologist who was more knowledgeable about his condition and/or simply waiting at least twenty-four hours to see if the administration of more than one dose of a beta-blocker and/or discontinuance of Atenolol would allow Snider's heart rate to return to a more normal range. All of these options were "appropriate" choices for Snider's circumstances under the published guidelines and according to the experts in the field who testified. Five medical experts agreed on the availability of these alternatives, and all opined that the standard medical practice would have been to employ these alternatives before "rushing" to a pacemaker implant which this patient ultimately did not need.

We point out the Medical Review Panel unanimously found "*Dr. Yue rushed the decision* for implantation of a permanent pacemaker in this patient." According to these three highly qualified medical experts, and Snider's treating physician, "[Dr. Yue] should have stopped the beta-blocker and the rivaroxabhan for 24-48 hours, and monitored the patient for possible improvement or deterioration in heart rate, before *making the decision* about a permanent pacemaker." (emphasis added). This finding is consistent with the nationally established "Indications for Permanent Cardiac Pacing." Dr. Yue's action was wholly inconsistent with the established guidelines and prescribed protocol. It simply was not an "appropriate choice" as he maintains. As Dr. Yue testified, Snider's condition at the time he recommended the pacemaker implant was not life-threatening. All medical experts in the case agreed with that assessment. Instead, as the Medical Review Panel acknowledged, *Dr. Yue made the decision for Snider* and inappropriately "rushed" to that decision. Snider's treating cardiologist and another expert in the field later

8

removed the pacemaker finding it was never necessary to implant and was not appropriate cardiac care for Snider. We therefore find the jury manifestly erred in concluding that the evidence did not preponderate in Snider's favor.

A plaintiff's burden of proof in a medical malpractice case against a physician was set forth by the supreme court in *Martin v. East Jefferson General Hospital*, 582 So.2d 1272, 1276 (La.1991):

> In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; *Smith v. State through DHHR*, 523 So.2d 815, 819 (La.1988); *Hastings v. Baton Rouge General Hospital,* 498 So.2d 713, 723 (La.1986). Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. *Housley v. Cerise*, 579 So.2d 973 (La. 1991); Smith, 523 So.2d at 822; *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Hastings*, 498 So.2d at 720.

*See also Goodwin v. Kufoy*, 07-737, (La.App. 3 Cir. 1/16/08), 974 So.2d 815.

Snider has shown that Dr. Yue's action fell below the standard of care, and he has shown that Dr. Yue's breach of his duty was the cause-in-fact of his damages. Because we have found the jury could not reasonably conclude that Dr. Yue's actions did not fall below the standard of care, we need not address the issues raised by Snider concerning Dr. Yue's failure to disclose his personal financial interest in performing the procedure nor is it necessary to address Snider's contention that Defendant improperly appealed to local bias by counsel's remarks to the jury in closing argument.

We therefore reverse the judgment of the trial court and render judgment in favor of Plaintiffs. Although the record contains some stipulations as to medical costs and references to the costs of the litigation, the trial judge elected to bifurcate the evidence concerning damages pending the jury's decision in the matter. The

9

jury's decision finding no liability aborted further proceedings in the matter. We therefore remand the matter to allow the parties an opportunity to complete the record regarding damages which may be due Plaintiffs.

## DECREE

Judgment is rendered in favor of Plaintiffs. All costs of this appeal are assessed against Defendants/Appellants. The case is remanded to the district court for a determination of the amount of damages to be awarded to Plaintiffs.

**REVERSED: JUDGMENT RENDERED AS TO LIABILITY: REMANDED FOR DETERMINATION OF DAMAGES.**