# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #023

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **5th day of May, 2015**, are as follows:

**PER CURIAM**:

2014-C -1964      CLYDE SNIDER, JR., ET UX v. LOUISIANA MEDICAL MUTUAL INSURANCE
                  COMPANY, ET AL. (Parish of Beauregard)

                  For the reasons assigned, the judgment of the court of appeal is
                  reversed.  The case is remanded to the court of appeal for
                  further proceedings consistent with this opinion.

                  JOHNSON, C.J., dissents.
                  KNOLL, J., dissents and assigns reasons.
                  CRICHTON, J., additionally concurs and assigns reasons.

SUPREME COURT OF LOUISIANA

NO. 2014-C-1964

CLYDE SNIDER, JR., ET UX

VERSUS

LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF BEAUREGARD

PER CURIAM

In this case, we are called upon to decide whether a jury's factual finding that a physician did not breach the appropriate standard of care is manifestly erroneous. For the reasons that follow, we find the jury's verdict is supported by the evidence and is not clearly wrong.

**FACTS AND PROCEDURAL HISTORY**

This case was previously before the court in *Snider v. Louisiana Medical Mut. Ins. Co.*, 13-0579 (La. 12/10/13), 130 So. 3d 922. The underlying facts were set forth in our opinion as follows:

> On May 13, 2007, within days of his twenty-seventh birthday, Clyde Snider, Jr., was hospitalized at CHRISTUS St. Patrick Hospital ("St. Patrick"), in Lake Charles, Louisiana, for a suspected myocardial infarction. Mr. Snider was treated by cardiologist Dr. Jean King White, who diagnosed him with coronary artery disease and acute coronary syndrome, which was treated with angioplasty and the implantation of a heart stent in Mr. Snider's circumflex artery. He was also placed on medications, including a cholesterol-lowering medication, a beta-blocker, and a blood thinner.
>
> On August 28, 2007 Mr. Snider sought treatment at the Beauregard Memorial Hospital ("Beauregard") emergency room in DeRidder, Louisiana for shortness of breath, chest

pains, dizziness, lightheadedness, and faintness. Mr. Snider disclosed his past medical history, which included the May 2007 heart attack and coronary artery disease treatment, as well as diabetes, hypertension, hyperlipidemia, and a strong family history of premature coronary artery disease. Beauregard cardiologist Dr. Robin Yue diagnosed Mr. Snider with symptomatic bradycardia, as his heart rate fell as low as thirty-five beats per minute (a normal heart rate is considered to be at least sixty beats per minute). Dr. Yue recommended heart catheterization and implantation of a pacemaker; Mr. Snider consented. The procedures were performed later that day, and Mr. Snider was discharged from the hospital the following day.

On the day of his discharge from Beauregard, Mr. Snider sustained an unrelated injury to the area of his pacemaker, when, on his return home, his two-year-old daughter ran to greet him and jumped into his arms, striking his chest and causing injury to the surgical site. Mr. Snider returned to the Beauregard emergency room that evening, complaining of numbness in his left arm and pain in his shoulder. Mr. Snider was examined by Dr. Yue, who noted redness, swelling, severe tenderness at the pacemaker surgical site, left shoulder pain, and left arm weakness. Because Dr. Yue was leaving town on a previously-scheduled business trip, Mr. Snider was left in the care of Dr. Flynn A. Taylor, who ordered that Mr. Snider be monitored for signs of infection and hematoma at the pacemaker implant site. Deeming outpatient antibiotic treatment appropriate, Dr. Taylor discharged Mr. Snider from Beauregard on September 3, 2007.

On September 4, 2007 Mr. Snider returned to St. Patrick, where he was previously treated for his May 2007 cardiac problems, and was admitted to the hospital. He was examined by his treating cardiologist there, Dr. White, who found symptoms of infection at the pacemaker surgical site. Dr. White recommended removal of the pacemaker. The next day, Dr. Michael C. Turner, a cardiovascular surgeon, removed the pacemaker.

Subsequently, Mr. Snider filed a medical malpractice complaint against Dr. Yue, which was presented to a medical review panel. The medical review panel concluded that Dr. Yue had failed to comply with the appropriate standard of care and that his conduct was a factor in the "minor resultant damage." The medical review panel issued the following reasons for their decision:

> Dr. Yue rushed the decision for implantation of a permanent pacemaker in this patient. He should have stopped the beta-blocker and the rivaroxaban for 24-48 hours, and monitored the patient for possible improvement or deterioration in heart rate, before making the decision about a permanent pacemaker. Except for the relatively minor complication of a hematoma, and the surgical scar after pacemaker extraction, we found no evidence of any long-term, major injury to this patient.

On December 16, 2010 Mr. Snider and his then-wife, Lisa Snider, individually and on behalf of their minor child, filed suit against Dr. Yue and his liability insurer, Louisiana Medical Mutual Insurance Company, seeking recovery for damages arising out of Dr. Yue's alleged negligence in the treatment of Mr. Snider on August 28, 2007. The Sniders alleged that Dr. Yue was at fault for: (1) failing to exercise a reasonable degree of skill and competence possessed and ordinarily exercised by members of his profession; (2) failing to provide Mr. Snider with diligent and skillful care; (3) failing to undertake conservative treatment to resolve Mr. Snider's medical condition and failing to stop his blood thinner medication prior to performing surgery; (4) proceeding to surgery for implantation of a pacemaker when Mr. Snider's condition and medications made said treatment contraindicated; (5) failing to consult with Mr. Snider's treating physician when Mr. Snider specifically asked that he be consulted; (6) failing to educate Mr. Snider on his true condition and the exact treatment being recommended and implemented; and (7) performing unnecessary surgery on Mr. Snider, resulting in complications requiring further treatment and surgery.

In March of 2012 this case was tried before a jury, which ruled in favor of Dr. Yue, finding that Mr. Snider had not proved by a preponderance of the evidence that Dr. Yue breached the applicable standard of care owed to Mr. Snider. The plaintiffs' subsequent motion for judgment notwithstanding the verdict and, alternatively, for new trial was denied by the district court judge, who stated that the jury verdict was not clearly contrary to the law and evidence.

*Snider*, 13-0579 at pp. 1-5, 130 So. 3d at 926-27.

Plaintiffs appealed, assigning multiple errors. On appeal, the court of appeal found merit to plaintiffs' assignment of error asserting Dr. Yue failed to properly

3

obtain Mr. Snider's informed consent to the pacemaker implantation surgery, because he failed to provide all of the information required by La. R.S. 40:1299.40(E). *Snider v. Louisiana Medical Mut. Ins. Co.*, 12-1068 (La.App. 3 Cir. 2/27/13), 129 So.3d 61.

Accordingly, the court of appeal rendered judgment in favor of the plaintiffs and against defendants on the issue of liability and remanded the matter to the district court to allow the parties an opportunity to complete the record as to damages.[1] Defendants sought review in this court. We granted writs and reversed the judgment of the court of appeal. *Snider v. Louisiana Medical Mut. Ins. Co.*, 13-0579 (La. 12/10/13), 130 So. 3d 922. In our opinion, we explained the court of appeal erred in failing to apply a manifest error standard of review to the jury's factual finding that informed consent was given in this case. Accordingly, we reversed the court of appeal's judgment and remanded the case to the court of appeal "to consider and rule upon plaintiffs' assignments of error, including those assignments of error pretermitted by the appellate court, in accordance with the views expressed herein." *Id.* at p. 22, 130 So. 3d at 939.

On remand, the court of appeal again reversed the trial court, rendered judgment as to liability, and remanded for determination of damages. *Snider v. Louisiana Medical Mut. Ins. Co.*, 12-1068 (La.App. 3 Cir. 8/27/14), 146 So.3d 965. In its opinion, the court of appeal reasoned the jury was manifestly erroneous in failing to find Dr. Yue's actions fell below the acceptable standard of care.[2]

---

[1] The issue of damages had been severed from the issue of liability and no quantum evidence was presented at trial after the jury verdict absolved the defendants of liability.

[2] Although our order of remand directed the court of appeal to review the jury's informed consent finding under a manifest error standard, the court of appeal pretermitted this issue, stating, " it is not necessary for us on remand to visit the question of informed consent again because even if Snider gave informed consent under Sections A or B of the statute, which the supreme court finds applicable, such consent has no bearing on the question of whether Dr. Yue's actions fell below the standard of care when

(continued...)

4

Upon defendants' application, we granted certiorari to review the correctness of this determination. *Snider v. Louisiana Medical Mutual Insurance Company*, 14-1964 (La. 12/8/14), 153 So. 3d 431.

**DISCUSSION**

It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). This test dictates that a reviewing court must do more than simply review the record for some evidence that may controvert the trial court ruling. Rather, it requires a review of the entire record to determine whether manifest error has occurred. Thus, the issue before the court of appeal is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. *Clay v. Our Lady of Lourdes Regional Medical Center*, 11-1797 (La. 5/8/12), 93 So.3d 536, 543. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La. 4/3/02), 816 So.2d 270, 278-79. Where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution

---

[2](...continued)
he rushed to implant a permanent pacemaker in the body of Snider." *Snider*, 12-1068 at p. 5, 146 So. 3d at 967-68.

of conflicts in expert testimony. *Bellard v. American Central Ins. Co.*, 07-1335 (La. 4/18/08), 980 So.2d 654, 672.

Considering these principles, we now turn to a review of the record. Specifically, we will look at the expert medical testimony to determine whether Dr. Yue's decision to implant the pacemaker was within the appropriate standard of care.

Dr. Michael Turner, tendered as an expert in cardiac pacing, cardiovascular disease and internal medicine, testified on behalf of plaintiffs. Dr. Turner testified in his opinion, the appropriate standard of care would have been to follow a conservative treatment rather than implanting the pacemaker. He testified he would have observed the patient for one day or several days and try drug therapy to alleviate the slow heartbeat. However, on cross-examination, Dr. Turner admitted the guidelines for pacemaker implantation were met in this case. He further acknowledged that it was fair to say some cardiologists would have made the choice to implant the pacemaker, even though he would not have done it.

Dr. Jean King White, Mr. Snider's treating cardiologist, testified on plaintiffs' behalf. Dr. White testified he did not have an opinion as to whether it was necessary for Dr. Yue to implant the pacemaker. He stated he never recommended Mr. Snider have a pacemaker because he had "never seen him with a slow heart rate except when he was on a beta blocker."

Defendants called Dr. Yue. Dr. Yue testified he relied on four considerations in recommending implantation of the pacemaker: (1) Mr. Snider had a very slow heart rate, below 40; (2) Mr. Snider was symptomatic, with symptoms of shortness of breath and chest pain; (3) Mr. Snider's heart rate became very fast when he was not on medication, and he needed to continue the medication to protect his heart; and (4) Mr. Snider's heart was weak, as shown by an echocardiogram. Dr. Yue testified he

6

did not see much benefit to waiting, pointing out that patients with low heart rates can become unstable.

Dr. Freddy Michel Abi-Samra testified for defendants as an expert in cardiology, internal medicine and electrophysiology. Dr. Abi-Samra discussed the categories set forth in the "Indications for Permanent Cardiac Pacing," and explained Mr. Snider's case presented a "clear type two indication for implantation." He further opined Dr. Yue was within the appropriate standard of care in performing the pacemaker implantation.

A review of the record in its entirety demonstrates the jury's conclusion that Dr. Yue did not breach the appropriate standard of care was reasonable. The defense expert, Dr. Abi-Samra, testified that Mr. Snider's condition clearly fell within Class II category in the "Indications for Permanent Cardiac Pacing," which permits implantation of a permanent pacemaker. While plaintiffs' expert, Dr. Turner, testified that he would not have implanted a pacemaker under the facts, he admitted the guidelines for pacemaker implantation were met in this case, and acknowledged some cardiologists would have made the choice to implant the pacemaker, even though he would not have done it. Faced with these different opinions, the jury obviously chose to accept the testimony of the defense expert. This conclusion is not manifestly erroneous.

Accordingly, we reverse the judgment of the court of appeal holding the jury was manifestly erroneous in failing to find Dr. Yue's actions fell below the acceptable standard of care. Consistent with our prior judgment in *Snider v. Louisiana Medical Mut. Ins. Co.*, 13-0579 (La. 12/10/13), 130 So. 3d 922, the case is remanded to the court of appeal to consider the remaining assignments of error in the appeal.

7

**DECREE**

For the reasons assigned, the judgment of the court of appeal is reversed.  The case is remanded to the court of appeal for further proceedings consistent with this opinion.

05/05/15

SUPREME COURT OF LOUISIANA

NO. 2014-C-1964

CLYDE SNIDER, JR., ET UX

VERSUS

LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF BEAUREGARD

JOHNSON, Chief Justice, dissents.

05/05/15

# SUPREME COURT OF LOUISIANA

## NO. 2014-C-1964

## CLYDE SNIDER, JR., ET UX.

## VERSUS

## LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, ET AL.

**KNOLL, Justice, dissenting.**

The majority herein concludes the evidence supports the jury's finding Dr. Robin Yue did not breach the applicable standard of care by emergently implanting a permanent pacemaker in the plaintiff without ambulatory monitoring or first regulating his prescribed drug therapy. However, after reviewing the entire record in this case, I can only conclude, as did the Court of Appeal, the jury did manifestly err in finding no malpractice. For this reason, I respectfully dissent from the majority's decision reinstating the jury's clearly erroneous findings. I would affirm the Court of Appeal's judgment finding Dr. Yue's actions fell below the acceptable standard of care.

In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. *Smith v. State through DHHR*, 523 So.2d 815, 819 (La.1988). A determination of whether a physician breached the appropriate standard of care owed to a particular plaintiff depends upon the facts and circumstances of the case. *Hunt v. Bogalusa Community Medical Center*, 303 So.2d 745, 746 (La. 1974). An appellate court

may not set aside a trial court's or jury's factual finding in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). Thus to reverse a trial court, the reviewing court must find from the record a reasonable factual basis does not exist for the finding, and further the finding is clearly wrong. *Mart v. Hill*, 505 So.2d 1120 (La. 1987). Though the standard of review is high, it does not require the reviewing court to abdicate its responsibility to review the trial court's findings, nor does it require the court to rubber stamp a jury's manifestly erroneous findings.

As the majority astutely notes "where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact." Slip Opinion at 5. This is so because "only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Rosell*, 549 So.2d at 844. However, although the manifest error doctrine is not easily broached, "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." *Menard v. Lafayette Ins. Co.*, 09-1869, p. 15 (La. 3/16/10), 31 So.3d 996, 1008 (quoting *Rosell*, 549 So.2d at 844-45).

The following is the objective evidence I find so contradictions the defendants' witnesses. Four physicians, including the three members of the medical review panel and plaintiff's treating cardiovascular surgeon, opined Dr.

Yue failed to comply with the appropriate standard of care. One member of the panel, Dr. Tommy Brown, testified on behalf of the entire panel, opining:[1]

> I do not [think Snider was a candidate for a pacemaker]. I think that he could have been managed by withholding his beta blocker and withholding his blood thinner…. Again, the big thing that we go back to, is that there's different beta blockers, there's different strength of beta blockers, there's different action of beta blockers. And to say that we need a pacemaker because he requires a beta blocker and he failed one specific beta blocker at one specific dose, I don't really think that's what we do in private practice every day…. I think he should have had a little time to see if his heart rate would have came up…. I think that would have been better served to wait and see if his bradycardia persisted. Again, he was stable. He wasn't in heart failure. He wasn't having ongoing angina. So I didn't think that there was an absolute rush to put the pacemaker in that day.

When then asked whether Dr. Yue's actions complied with the ordinary standard of care for cardiologists, Dr. Brown along with the other two members of the panel found Dr. Yue's actions did not. *See* Slip Opinion at 2-3. Dr. Michael Turner, accepted as an expert in implanting cardiology, agreed testifying:

> Q. In your opinion, as far as the standard of care dealing with cardiologists implanting pacemakers, between the conservative treatment and implanting the pacemaker on this particular day that Dr. Yue saw him, what is your opinion about the standard of care there?
> A. If we define the standard of care as what most implanting cardiologists would have done at that time, it would have been to wait.
> Q. Wait and do what?
> A. Observe for a period of time, maybe a day, maybe several days, depending on the course. Very likely withdraw or try to alter drug therapy to alleviate the slow heartbeat.

Moreover, the physician called by defendant, Dr. Freddy Michael Abi-Samra, conceded, as suggested by the national guidelines, the implantation of a permanent pacemaker herein was not "emergent." Significantly, a document was admitted into evidence entitled "Indications for a Permanent Cardiac Pacing," listing the classifications for a permanent pacing as established by a joint task force

---

[1] The testimony of the other two members were stipulated to as their testimony would have been identical to Dr. Brown's.

3

formed by the American College of Cardiology, the American Heart Association, and the Heart Rhythm Society. These guidelines set forth three classifications:

> Class I—Conditions in which permanent pacing is definitely beneficial, useful, and effective. In such conditions, implantation of a cardiac pacemaker is considered acceptable and necessary, ***provided that the condition is not due to a transient cause***.

> Class II—Conditions in which permanent pacing may be indicated but there is conflicting evidence and/or divergence of opinion; class IIA refers to conditions in which the weight of the evidence/opinion is in favor of usefulness/efficacy, while class IIB refers to conditions in which the usefulness/efficacy is less well established by evidence/opinion.

> Class III—Conditions in which permanent pacing is not useful/effective and in some cases may be harmful.

> Symptoms—Patients frequently present for consideration of pacemaker placement because of symptoms that may be due to bradyarrhythmias (e.g. dizziness, lightheadedness, syncope, fatigue, and poor exercise tolerance.) These patients will often have evidence of mild or intermittent sinus node dysfunction or conduction abnormalities. ***It is critical to attempt to establish a direct correlation between symptoms and bradyarrhythmias. This is done via a careful history and ambulatory monitoring***.

> A direct correlation between symptoms and bradyarrhythmias will increase the likelihood of recommending pacemaker placement. On the other hand, ***failure to document such a correlation or the presence of an alternative explanation for symptoms will make pacemaker placement less likely or even contraindicated***. (Emphasis added).

As the guidelines clearly provide, in non-emergent or non-life threatening situations, like the one herein, a cardiologist should "wait and see" before implanting a permanent pacemaker as a period of monitoring is necessary in order to ensure "the condition is not due to a transient cause." These guidelines also caution failure to document a direct correlation between symptoms and bradycardia or the presence of an alternative explanation of the symptoms will make pacemaker placement less likely or even contraindicated. Here, the record undeniably shows Dr. Yue did not heed these warnings as he failed to do

4

ambulatory monitoring or even determine if Snider's condition was due to a transient cause, like the beta blockers.

Regarding the proper classification herein and the need for immediate action, Dr. Abi-Samra testified there was a clear indication this was a Class II implantation and as such would "benefit the patient, especially in the lifestyle, rather than the immediate survival or immediate prevention of immediate death." It was not, according to him, an emergency surgery or anything of that sort, specifically "[i]t was not necessarily emergent."

Accordingly, the overall testimony and the objective medical evidence establish Snider's presentation at the emergency room did not call for or require immediate surgery. The objective evidence clearly shows the jury's factual error as it was not necessarily Dr. Yue's performance of the procedure that breached the applicable standard, but rather his "rush," or more appropriately his decision, to perform this particular procedure emergently based solely on the symptoms presented in the emergency room the very same day that constitutes malpractice. Though as the majority finds the evidence does reasonably show a young man at 26 years of age, facing a lifetime of beta blockers and drug therapy, may very well be a candidate for a Class II implantation of a permanent pacing device, that same evidence nevertheless conclusively and objectively establishes the implantation herein was not emergent because plaintiff was stable, not in heart failure, and with no ongoing angina. Thus, under the facts and circumstances of this case, the objective medical evidence clearly shows Dr. Yue breached the ordinary standard of care in his rush to treat the plaintiff's symptoms through the implantation of a permanent pacemaker.

Given the medical guidelines, the medical testimony, and the panel's undisputed medical findings—all agreeing Dr. Yue rushed the decision for

implantation of a permanent pacemaker without first stopping the patient's medication and monitoring for possible improvement in heart rate—a reasonable fact finder would not have found as this jury did on the issue of breach of the applicable standard of care. The Court of Appeal is an errors correcting court that properly reversed the jury's verdict in its manifest error review. For these reasons, I would affirm the Court of Appeal.

# SUPREME COURT OF LOUISIANA

## No. 2014-C-1964

## CLIDE SNIDER, JR., ET UX.

## VERSUS

## LOUISIANA MEDICAL MUTUAL INSURANCE CO., ET AL.

CRICHTON, J., additionally concurs and assigns reasons:

I concur in the per curiam opinion reversing the court of appeal. I write separately to emphasize the substantial weight given to a jury's finding of fact under Louisiana law. *See Rosell v. ESCO*, 549 So. 2d 840, 844 (La. 1989). As esteemed late Justice Albert Tate, Jr. observed, the rule of limited appellate review in the absence of manifest error "requires that the appellate court will not disturb the trial court's express or implied factual findings if the evidence is reasonably open to any interpretation in accord therewith." A. Tate, *"Manifest Error" – Further observations on appellate review of facts in Louisiana civil cases*, 22 La. L. Rev. 605, 611 (1962).

The court of appeal disregarded this mandate in this case, despite the fact that the evidence presented at trial was "reasonably open to any interpretation" in accordance with the jury's verdict. Indeed, as the per curiam explains, even plaintiffs' own expert testified on cross-examination that the guidelines for pacemaker implantation were met in this case. As a result, I believe that, consistent with prior jurisprudence of this Court, the case is properly reversed.